United States District Court
District of Columbia

| | | |
|---|---|---|
| David O'Connell, individually and on behalf of all others similarly situated, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Case no. 1:20-cv-01365-KBJ |
| United States Conference of Catholic Bishops, | § § § | Class Action |
| Defendant. | § § | |

**Memorandum of Points and Authorities in Opposition
to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction,
for Judgment on the Pleadings or, in the Alternative, for Summary Judgment**

Marc R. Stanley
marcstanley@mac.com
Martin Woodward
mwoodward@stanleylawgroup.com

**STANLEY LAW GROUP**
6116 N. Central Expressway
Suite 1500
Dallas, Texas 75206
214.443.4300
214.443.0358 (fax)

August 7, 2020

**Table of Contents**

Table of Contents ....................................................................................................... i

Table of Authorities ................................................................................................. iii

I.      Introduction ....................................................................................................1

II.     Background .....................................................................................................2

        A.      USCCB is required to honor the intent
                of all donors to Peter's Pence
                throughout the United States .................................................................2

        B.      USCCB specifically promotes Peter's Pence
                as a collection for emergency assistance
                to the neediest around the world ...........................................................5

        C.      Contrary to USCCB's assurances that
                the donations would be used for emergency
                assistance for the needy and its representations
                that it would ensure the final use of the donations
                for this purpose, Peter's Pence funds are used for
                investments in real estate and Hollywood films ................................. 7

        D.      David O'Connell donated to Peter's Pence
                after USCCB told him his donation would
                be applied for emergency assistance .....................................................9

III.    Procedural History .......................................................................................10

IV.     USCCB fails to show entitlement to judgment under Rule 12(c) as to any of the three
        claims ............................................................................................................11

        A.      Standard of review under Rule 12(c) ...................................................11

        B.      USCCB's challenge to Mr. O'Connell's
                fraud claims is procedurally improper
                and meritless .......................................................................................12

        C.      USCCB cannot disavow its own
                Guidelines in an attempt to disclaim
                any fiduciary duty to donors ...............................................................17

        D.     The Court can order USCCB to
disgorge unjust enrichment even
if USCCB does not hold onto the money..............................................................19

V.      USCCB fails to establish that the Court lacks subject matter jurisdiction under Rule
12(b)(1) ......................................................................................................................23

        A.     Standard of review under Rule 12(b)(1) ...........................................23

        B.     Accepting the allegations as true, the Court
can resolve the claims against USCCB without
interpreting religious questions and by applying
neutral principles of law, and it therefore
has subject matter jurisdiction ...........................................................23

VI.    Conclusion ...................................................................................................................26

Certificate of Service ................................................................................................................28

**Table of Authorities**

<u>Federal cases</u>

*Allen v. U.S. Dep't of Educ.*,
    755 F. Supp. 2d 122 (D.D.C. 2010) ...................................................................................3

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*,
    387 F. Supp. 3d 71 (D.D.C. 2019) ...............................................................................24, 25

*Cause of Action Inst. v. Internal Revenue Serv.*,
    390 F. Supp. 3d 84 (D.D.C. 2019) ...............................................................................23, 24

*Church of Scientology Intern. v. Eli Lilly & Co.*,
    848 F. Supp. 1018 (D.D.C. 1994) ..................................................................................17

*Cordoba Initiative Corp. v. Deak*,
    900 F. Supp. 2d 42 (D.D.C. 2012) .................................................................................17

*Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*,
    793 F.Supp.2d 311 (D.D.C. 2011) .................................................................................17

*Democracy Partners v. Project Veritas Action Fund*,
    --- F. Supp. 3d ---, Civil Action No. 17-1047 (ESH),
    2020 WL 1536217 (D.D.C. March 31, 2020) ...............................................................17

*Dentons US LLP v. Rep. of Guinea*,
    134 F. Supp. 3d 5 (D.D.C. 2015) ...................................................................................23

*Firestone v. Firestone*,
    76 F.3d 1205 (D.C. Cir. 1996) .......................................................................................17

*Gregorio v. Hoover*,
    238 F. Supp. 3d 37 (D.D.C. 2017) ...............................................................................24, 25

*He Depu v. Yahoo, Inc.*,
    950 F.3d 897 (D.C. Cir. 2020) .......................................................................................19

*Hurd v. Dist. of Columbia*,
    864 F.3d 671 (D.C. Cir. 2017) ....................................................................................2, 18

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
    538 U.S. 600 (2003) ....................................................................................................25, 26

*In re APA Assessment Fee Litig.*,
    766 F.3d 39 (D.C. Cir. 2014) .........................................................................................20

*Murphy v. Dept. of Air Force*,
 326 F.R.D. 47 (D.D.C. 2018)................................................................................11, 13, 14

*Northrop Grumman Corp. v. Factory Mutual Ins. Co.*,
 Case No. CV 05-08444 DDP (PLAx),
 2006 WL 8422003 (C.D. Cal. Aug. 9, 2006)....................................................................13

*Osborn v. Griffin*,
 865 F.3d 417 (6th Cir. 2017) ........................................................................................21, 22

*Paul v. Judicial Watch, Inc.*,
 543 F. Supp. 2d 1 (D.D.C. 2008) ..................................................................................21, 22

*Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*,
 60 F. Supp. 3d 36 (D.D.C. 2014)...................................................................................21, 22

*Sec. & Exch. Comm'n v. Contorinis*,
 743 F.3d 296 (2d Cir. 2014).....................................................................................20, 21, 22

*Serbian Eastern Orthodox Diocese v. Milivojevich*,
 426 U.S. 696 (1976)...............................................................................................................25

*Smith v. O'Connell*,
 986 F. Supp. 73 (D.R.I. 1997) ............................................................................................25

*Unified Container, LLC v. Mazuma Capital Corp.*,
 280 F.R.D. 632 (D. Utah 2012) ..........................................................................................13

*U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.*,
 251 F.Supp.2d 114 (D.D.C. 2003) ..............................................................................12, 13, 14, 16

*U.S. ex rel. Tran v. Computer Sciences Corp.*,
 53 F. Supp. 3d 104 (D.D.C. 2014) ..............................................................................14, 15, 16

*U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*,
 685 F. Supp. 2d 129 (D.D.C. 2010) .........................................................................................20, 21

State Cases

*4934, Inc. v. D.C. Dept. of Employment Servs.*,
 605 A.2d 50 (D.C. App. 1992)..............................................................................................20

*Rashedi v. Gen'l Bd. of Church of Nazarene*,
    54 P.3d 349 (Ariz. 2002)................................................................25

*Schmidt v. Catholic Diocese of Biloxi*,
    18 So. 3d 814 (Miss. 2009)......................................................24, 25


<u>State Statutes</u>

OHIO REV. CODE ANN. § 1716.17 ...........................................................18, 19

UTAH CODE ANN. § 13-22-23 .....................................................................18


<u>Federal Rules of Civil Procedure</u>

Fed. R. Civ. P. 9(b) ............................................................................ *passim*

Fed. R. Civ. P. 12(b)(1)........................................................................2, 23

Fed. R. Civ. P. 12(b)(2)........................................................................10, 12

Fed. R. Civ. P. 12(b)(3)........................................................................10, 12

Fed. R. Civ. P. 12(b)(6).................................................................... *passim*

Fed. R. Civ. P. 12(c) ........................................................................ *passim*

Fed. R. Civ. P. 12(d)..............................................................................2, 18

Fed. R. Civ. P. 12(h)(3)............................................................................23

Fed. R. Civ. P. 34 ...............................................................................10, 12


<u>Other Authorities</u>

*Group Exemptions, IRS Publication 4573,* INTERNAL REVENUE SERVICE 1 (2007),
    http://www.irs.gov/pub/irs-pdf/p4573.pdf.....................................................3

*IRS Group Exemption letter to USCCB,* http://www.usccb.org/about/general-
    counsel/upload/2019-IRS-Det-Ltr-CURRENT.pdf..........................................3

LCvR 7(h)..............................................................................................2

Jesse R. Loffler, *Catholicpac: Why the United States Catholic Conference of Bishops Should (Probably) Lose Its 501(c)(3) Tax-Exempt Status*, 14 RUTGERS J. L. & REL. 69 (2012) ..................................................................3

GIANLUIGI NUZZI, MERCHANTS IN THE TEMPLE: INSIDE POPE FRANCIS'S SECRET BATTLE AGAINST CORRUPTION IN THE VATICAN (2015) ....................................................7

"Transmittal Form," http://www.usccb.org/about/national-collections/collection-administration/upload/ppc-2013.pdf ..........................................................19, 22

United States Conference of Catholic Bishops, *One Church, One Mission: Guidelines for Administering USCCB National Collections in Dioceses* (2011), http://www.usccb.org/about/national-collections/collection-administration/upload/one-church-one-mission-guidelines-national-collections.pdf ................................3, 4, 5, 18, 19

"Vatican invested in Lapo Elkann and Elton John film," *Corriere della Sera* (English), December 4, 2019, available at https://www.corriere.it/english/19_dicembre_04/vatican-invested-lapo-elkann-and-elton-john-film-72e070b0-16c0-11ea-b17e-02f19725a806.shtml?refresh_ce-cp ........................................................................8

"Vatican Uses Donations for the Poor to Plug Its Budget Deficit," *Wall Street Journal*, December 11, 2019, available at https://www.wsj.com/articles/vatican-uses-donations-for-the-poor-to-plug-its-budget-deficit-11576075764 ......................................................8

"Vaticano, 'I milioni per i poveri in paesi offshore e per operazioni di dubbia eticità," *L'Espresso*, October 17, 2019, available at http://espresso.repubblica.it/plus/articoli/2019/10/17/news/vaticano-obolo-san-pietro-1.340060 ....................................................................................................7

"Vatileaks journalists cleared as PR consultant and priest found guilty," *The Guardian*, July 7, 2016, available at https://www.theguardian.com/world/2016/jul/07/vatileaks-journalists-cleared-vatican-court-trial-catholic-church ........................................................7

## I.       Introduction

Rule 12(c) is not a vehicle for resuscitating a Rule 12(b)(6) argument mooted entirely by an answer that specifically denies (and, thus, places in issue) every factual allegation in a complaint. Yet, that is USCCB's gambit. Having declined in an earlier Rule 12 motion to challenge the sufficiency of Mr. O'Connell's complaint, USCCB now attacks Mr. O'Connell's allegations as not specific enough to support the claims he raises. In stark contrast, USCCB had no difficulty filing an answer that disputes nearly every allegation. Because the parties' pleadings reflect an abundance of material disputes of fact, USCCB cannot possibly obtain a judgment on the pleadings.

Moreover, notwithstanding USCCB's untimely quibbles over specificity, Mr. O'Connell's allegations directly and sufficiently support his claims of fraud, breach of fiduciary duty, and unjust enrichment. The complaint comprehensively documents that the funds raised from USCCB's deliberate solicitation of gifts are not used for the specific purposes represented, contrary to USCCB's own guidelines and donor intent.

Separately, USCCB also claims the Court lacks subject matter jurisdiction, insisting that the resolution of Mr. O'Connell's three common law claims will impermissibly encroach on matters of internal Church governance protected from civil court scrutiny by the First Amendment. But these claims all turn on whether USCCB was truthful in its representations to donors, an inquiry involving routine and neutral methods of proof that do not risk entrapping the Court into ruling on Constitutionally protected religious questions. USCCB's promotion of Peter's Pence is not an innately religious activity even when it occurs in a church under the control of a religious organization, and it is clear the Court has subject matter jurisdiction.

1

## II.      Background

Although most of its motion attacks the sufficiency of Mr. O'Connell's allegations,

USCCB prefaces its arguments with a "background" section—bereft of citations or references to

the complaint—throughout which USCCB strives to distance itself from the Peter's Pence

collection. DKT #22-1 ("Motion") at 3-6. For this reason, it is essential to examine at the outset

what the complaint actually alleges, and—to the extent it is ascertainable without discovery for

purposes of this motion[1]—what role USCCB actually plays with respect to the Peter's Pence

collection.

### A.      USCCB is required to honor the intent of all donors to Peter's Pence throughout the United States

USCCB is the episcopal conference of the Catholic Church in the United States. DKT #1

("Complaint") at 3 (¶ 9); DKT #20 ("Answer") at 4 (¶ 9). It is composed of all active and retired

members of the Catholic hierarchy in the United States. Complaint at 3 (¶ 9); Answer at 4 (¶ 9).

---

[1] As discussed *infra* Part IV(A) at 11 & Part V(A) at 23, the standards of review under Fed. R. Civ. P. 12(c) and 12(b)(1) apply to this motion. Nevertheless, USCCB filed a supporting declaration with its motion, DKT #22-3 ("Declaration"), and it blithely suggests that "[t]o the extent … the Court chooses to rely on [the] declaration, it may convert this motion to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d)." Motion at 5 n.8 (citation in original). Rule 12(d) says that, in such an event, "[a]ll parties must be given a reasonable opportunity to present *all* the material that is pertinent to the motion." Fed. R. Civ. P. 12(d) (emphasis added). And the D.C. Circuit has explained that any such conversion must be "exercised with great caution and attention to the parties' procedural rights," requiring "notice to the parties of the court's intention to convert the motion *and a reasonable opportunity to discover and present evidence*." *Hurd v. Dist. of Columbia*, 864 F.3d 671, 687 (D.C. Cir. 2017) (emphasis added). As Mr. O'Connell explains more fully *infra*, the Court should deny USCCB's motion without converting it to a motion for summary judgment, and the case should proceed to discovery for the development of a fulsome factual record of all issues raised by his claims. To address insinuations made by USCCB in its references to documents outside the complaint, Mr. O'Connell occasionally cites to publicly available materials, which (as discussed *infra* at 23) the Rule 12(b)(1) standard allows; but, by doing this, he does not concede that a summary "trial by website" is appropriate for any material fact related to USCCB's motion, and he therefore does not request the Court to take formal judicial notice of those materials. Consistently, in his LCvR 7(h) "Statement of Genuine Issues" filed herewith to address USCCB's Declaration and related Statement (DKT #22-2), he does not cite competing evidentiary materials, as there has not been the requisite opportunity for discovery to allow the presentation of such evidence. Fed. R. Civ. P. 12(d); *Hurd*, 864 F.3d at 687. In sum, the Court should note that USCCB's evident inability to make Rule 12 arguments without extraneous evidence suggests that its Rule 12 motion should be denied, and that discovery should proceed forthwith.

The Catholic Church in the United States is divided into dioceses, which are comprised of parishes. Motion at 5 n.9. In at least one respect, USCCB represents that it has the authority to generally supervise and control every Catholic diocese, parish, church, and affiliated entity in the United States.[2] This is evident from the group tax exemption USCCB applies for and receives every year, which it submits on behalf of itself and every one of these subordinate organizations; USCCB cannot secure this exemption without affirming to the Internal Revenue Service that all of the subordinates are subject to its supervision or control.[3]

Part of USCCB's mission extends to its supervision of national charitable collections. In 2011, it published a document entitled "One Church, One Mission: Guidelines for Administering USCCB National Collections in Dioceses" (the "Guidelines").[4]  As is evident from the title of the Guidelines—"One Church, One Mission"—USCCB's purpose is to ensure that standardized procedures and protocols are followed in all dioceses, parishes, and churches; the Guidelines "are for the use of the diocesan bishops and other leaders as well as parish staff who oversee and administer the national collections." Guidelines at 2. Further, they "are binding upon dioceses[.]" *Id*.

---

[2] *See, e.g.*, Jesse R. Loffler, *Catholicpac: Why the United States Catholic Conference of Bishops Should (Probably) Lose Its 501(c)(3) Tax-Exempt Status*, 14 RUTGERS J. L. & REL. 69, 71-76 (2012).

[3] Loffler, *supra* note 2, at 74 (citing *Group Exemptions, IRS Publication 4573*, INTERNAL REVENUE SERVICE 1 (2007), http://www.irs.gov/pub/irs-pdf/p4573.pdf (accessed July 20, 2020)); *see also* http://www.usccb.org/about/general-counsel/upload/2019-IRS-Det-Ltr-CURRENT.pdf (accessed July 20, 2020). In its motion, USCCB explains that because the complaint cites various sections of the USCCB website, the website is incorporated by reference into the complaint. *See* Motion at 3 n.2 (citing *Allen v. U.S. Dep't of Educ.*, 755 F. Supp. 2d 122, 125 (D.D.C. 2010)). *Allen* involved the application of the Rule 12(b)(6) standard of review which does not apply to USCCB's motion, and it does not hold that a complaint incorporates the entire contents of a website merely by citing to it. *See Allen*, 755 F. Supp. 2d at 125. Nevertheless, Mr. O'Connell does not object to citations of or references to materials from the USCCB website for purposes of this motion.

[4] http://www.usccb.org/about/national-collections/collection-administration/upload/one-church-one-mission-guidelines-national-collections.pdf (accessed July 16, 2020). USCCB also cites to this document, Motion at 4 & n.4, and it is discussed and pictured in Mr. O'Connell's complaint. Complaint at 9-10 (¶ 26).

The Peter's Pence collection is one of several national collections that are assigned a national date (for instance, in 2019, all dioceses were instructed to specially collect for Peter's Pence in all churches on June 30).[5] *Id*. at 8. The Guidelines list Peter's Pence as one example of a national collection established by the Vatican, but they do not otherwise differentiate it from national collections generally. *Id.* at 3.[6] In advance of each national collection, "[a]n education and awareness-building campaign is developed around that date; parishes and dioceses are urged to use a variety of materials to inform parishioners of the collection … explain[ing] why the special collection is being taken, for what the proceeds will be used, and how past resources have been utilized." *Id*.

Importantly, the Guidelines "call for the highest level of transparency and accountability in all national collection activities. All collection funds received are used solely to support the individual mandate of the specific collection. The USCCB Committee and Office of National Collections comply with the charitable standards set by leading donor advisory services." *Id*. at 4. Moreover, "It is up to each diocese and to the [USCCB'S] Office of National Collections *to ensure that all funds collected are used solely for the expressed purposes announced in the collection mandates and promotion materials*." *Id*. at 5 (emphasis added).[7]

In his complaint, Mr. O'Connell discusses and quotes extensively from the "Donor Intent" section of the Guidelines, where USCCB promises to preserve the principles and

---

[5] *See* https://www.usccb.org/about/national-collections/collection administration/upload/2018_2019_2020_collxndates.pdf (accessed August 5, 2020).

[6] Despite USCCB's claim that "it has a limited role in the promotion of the Peter's Pence collection in this country," Motion at 1, the Guidelines are clear that the promotional aspect of its role also extends to "coordinating, supporting, and increasing the revenues of the national collections," including Peter's Pence. Guidelines at 3.

[7] USCCB's profession of ignorance and lack of control over the ultimate disposition of donor funds is irreconcilable with this statement. *Compare* Motion at 1 & Declaration at 3 (¶ 5) *with* Guidelines at 5.

requirements of donor intent "throughout the entire collection process, from the announcement of the intention of the collection, through the safeguarding and delivering of funds, to the final use by the various collection Subcommittees of the USCCB, including the use and reporting by eventual recipient grantees." Complaint at 9-10 (¶ 26) (quoting Guidelines at 5).

The Guidelines also prescribe "that the proceeds be sent without delay and in their entirety. … [N]ot to turn over the entirety of the collection *immediately* is to violate the intentions of the donors and, as such withholding becomes known, seriously to compromise the perceived integrity of fund-raising in the church." *Id*. at 6 (emphasis added).[8]

In sum, the Guidelines leave no room for doubt: USCCB—itself and through its subordinates—promised to be scrupulously honest to donors before, during, and after the Peter's Pence collection process, specifically with regard to making sure that all the money contributed is ultimately used as advertised to the donors.

### B.   USCCB specifically promotes Peter's Pence as a collection for emergency assistance to the neediest around the world

To advertise and encourage contributions to the annual Peter's Pence special collection, USCCB creates and distributes uniform promotional materials for specific use in parishes and dioceses.[9] Complaint at 6 (¶ 20). These include a social media tool kit, church bulletin inserts, letters from bishops, web ads, posters, and print ads, all freely downloadable from USCCB's

---

[8] This statement further calls into question USCCB's suggestions that immediacy is not implicated in its Peter's Pence solicitations, Motion at 2-3, even though the wording of all the promotional materials USCCB uses are, on their faces, meant to communicate an immediate need. *See infra* Part II(B) at 5-6.

[9] USCCB also promotes its other national collections (including the Catholic Campaign for Human Development, Catholic Communication Campaign, Catholic Home Missions Appeal, Catholic Relief Services Collection, Church in Central and Eastern Europe, Church in Latin America, and Solidarity Fund for Africa) by making similar materials available for parishes and dioceses. *See* http://www.usccb.org/about/national-collections/who-we-are.cfm (accessed July 24, 2020).

website. *Id*. All of the Peter's Pence solicitation materials contain the same standardized representation, as stated in USCCB's sample church bulletin insert: "Donations to this collection support the charitable works of Pope Francis for the relief of those most in need." *Id*. ¶ 21.

In his complaint, Mr. O'Connell includes a picture of USCCB's bulletin solicitation insert, in which this particular year, USCCB directly connects donations to Peter's Pence with famine relief and medicine for drought-stricken regions of Ethiopia. *Id*. at 7 (¶ 22). USCCB's exemplar "bulletin announcements," also pictured in the complaint, have a similar approach, describing the purpose of the Peter's Pence collection as follows: "The proceeds benefit our brothers and sisters on the margins of society, including victims of war, oppression, and natural disasters." *Id*. at 8 (¶ 23).  And with knowledge (described *infra*) of the falsity of the representation, USCCB also furnishes specific verbiage for Peter's Pence appeals to be read from the pulpit at church services: "Catholics around the globe support this collection to help the Holy Father reach out to people suffering in our world, especially those enduring the effects of war and violence, natural disasters, and religious persecution." *Id*. ¶ 24, 19 (¶ 50).

Mr. O'Connell alleges he was deceived and that his and others' contributions did not go to help the poor and suffering. *Id*. at 11-14 (¶¶ 27-33). And, significantly, none of the representations dictated by the USCCB informed him or others that Peter's Pence contributions would be used as a discretionary fund for the Pope or the Vatican or to purchase posh properties in London; without exception, every single one emphasizes that the purpose of the collection is to aid the neediest. *Id*. at 6-8 (¶¶ 20-24).[10]

---

[10] In its Motion, USCCB tries to recast Peter's Pence as a discretionary fund for the use of the Pope. It attempts to downplay the consistency of its advertising materials' emphasis on the Peter's Pence collection as a vehicle intended exclusively for aid to the destitute by citing verbiage from a number of different website pages. *See* Motion at 4. Tellingly, nowhere in its Motion does USCCB addresses any of the actual advertising materials it uses for Peter's Pence that are the subject of the allegations of the complaint. *See generally motion*.

**C.     Contrary to USCCB's assurances that the donations would be used for emergency assistance for the needy and its representations that it would ensure the final use of the donations for this purpose, Peter's Pence funds are used for investments in real estate and Hollywood films**

While the revelations of the diverted Peter's Pence funds found their way into the mainstream American press for the first time only late last year, the Vatican's extensive use of donor funds for investment purposes rather than for poverty relief was evidently well known to the Catholic hierarchy for several years. In 2015, after acquiring leaked documents from the Vatican, Italian journalist Gianluigi Nuzzi published the English language version of his book *Merchants in The Temple*, which detailed Vatican financial corruption. Discussing Peter's Pence, Nuzzi posited that "For every euro that finds its way to the Holy Father, barely 20 cents end up in actual projects to help the poor."[11] For publishing his book, Nuzzi was tried in a Vatican court and ultimately acquitted in 2016—although the Monsignor who leaked the documents was sentenced to prison.[12]

On October 17, 2019, the Italian news magazine *L'Espresso* published a story sourced from secret internal Vatican investigative reports.[13] Complaint at 11 (¶ 27). The *L'Espresso* story revealed that most of the Peter's Pence funds are diverted into "reckless speculative operations," with 77% of the collections—roughly $560 million—given to Credit Suisse, a Swiss-based

---

[11] GIANLUIGI NUZZI, MERCHANTS IN THE TEMPLE: INSIDE POPE FRANCIS'S SECRET BATTLE AGAINST CORRUPTION IN THE VATICAN 56 (2015).

[12] *See* "Vatileaks journalists cleared as PR consultant and priest found guilty," *The Guardian*, July 7, 2016, available at https://www.theguardian.com/world/2016/jul/07/vatileaks-journalists-cleared-vatican-court-trial-catholic-church (accessed July 18, 2020).

[13] "Vaticano, 'I milioni per i poveri in paesi offshore e per operazioni di dubbia eticità," *L'Espresso*, October 17, 2019, available at http://espresso.repubblica.it/plus/articoli/2019/10/17/news/vaticano-obolo-san-pietro-1.340060 (accessed August 4, 2020).

investment company. *Id*. at 12 (¶ 28).  The story also detailed how $200 million were used to purchase real estate in London for a luxury apartment development. *Id*.

On December 4, 2019, the Italian newspaper *Corriere della Sera* published additional details on the diversion of Peter's Pence funds.[14] *Id*. ¶ 29. This revealed that more than $1 million was invested in the Elton John biopic *Rocketman*, and more than $3.6 million in the film *Men in Black: International*. *Id*. Additionally, millions of dollars were invested in a Malta-based investment company called Centurion Global Fund run by an Italian financier named Enrico Crasso, who received "millions of euros in commissions" while losing 4.61% of the fund (approximately two million euros) by the end of 2018. *Id*.

On December 11, 2019, the story attracted attention in the United States when the *Wall Street Journal* reported that only 10% of donations to the Peter's Pence collection actually go to charitable works.[15] *Id*. at 13 (¶ 30). Most of the money was apparently used to plug holes in the Vatican's administrative budget, and "for at least the past five years, only about 10% of the money collected—more than €50 million was raised in 2018—[went] to the sort of charitable causes featured in advertising for the collection, according to people familiar with the matter." *Id*.

---

[14] "Vatican invested in Lapo Elkann and Elton John film," *Corriere della Sera* (English), December 4, 2019, available at https://www.corriere.it/english/19_dicembre_04/vatican-invested-lapo-elkann-and-elton-john-film-72e070b0-16c0-11ea-b17e-02f19725a806.shtml?refresh_ce-cp (accessed August 4, 2020).

[15] "Vatican Uses Donations for the Poor to Plug Its Budget Deficit," *Wall Street Journal*, December 11, 2019, available at https://www.wsj.com/articles/vatican-uses-donations-for-the-poor-to-plug-its-budget-deficit-11576075764 (accessed August 4, 2020).

**D.     David O'Connell donated to Peter's Pence after USCCB told him his donation would be applied for emergency assistance**

David O'Connell regularly attends Sunday mass at Sacred Heart Church in East Providence, Rhode Island. Complaint at 14 (¶ 34). As directed by USCCB, he was solicited from the pulpit during a Sunday mass in the summer of 2018 to make a donation to the Peter's Pence collection to help those in need of emergency relief. *Id*. Believing that he was doing something to help the suffering, he made a donation in cash. *Id*. at 14 (¶ 34), 15 (¶ 36). Nothing he saw or heard, on that day or beforehand, told him or made him understand that his donations to Peter's Pence would be used for anything other than emergency assistance to the neediest people around the world. *Id*. at 14-15 (¶ 34).

Even if he had slowly and carefully researched external sources such as the USCCB or Vatican websites, he would still reasonably be unaware that his donations to Peter's Pence would not be used entirely and exclusive for emergency assistance to the poor. *Id*. at 15 (¶ 35). He had no reason to suspect that the Peter's Pence collection was actually used for investments and other purposes rather than for emergency assistance. *Id*.

USCCB promised to ensure donations for emergency assistance were not being used to create a slush fund to defray Vatican administrative expenses. *See id*. at 9-10 (¶ 26), 15 (¶¶ 35-36).  Mr. O'Connell donated money for specific charitable purposes, and he alleges his money was directed into other, non-charitable purposes. *Id*. at (¶ 36). Sadly, millions of well-meaning donors across the country hoping to help poorest of the poor ended up in the exact same position as Mr. O'Connell. *Id*.

9

### III.    Procedural history

Mr. O'Connell filed his complaint in the District of Rhode Island in January of this year.
DKT #1. USCCB responded with a motion to dismiss the complaint under Fed. R. Civ. P.
12(b)(2) and (b)(3). DKT #7. The Rule 12(b) motion only challenged personal jurisdiction and
venue in Rhode Island—USCCB made no argument that the Complaint failed to state a claim
upon which relief could be granted, nor did it request a more definite statement. *Id*. Based on
USCCB's representations that "[e]verything that the USCCB did in relation to the Peter's Pence
Collection, it did in Washington, D.C.," Mr. O'Connell cross-moved to transfer venue to this
Court. DKT #8-1 at 2 (quoting DKT #7-1 at 17).

USCCB opposed the transfer request, and it continued to press for dismissal of the case in
its entirety. DKT #9. On May 21, 2020, the Rhode Island District Court granted Mr. O'Connell's
request, denied USCCB's motion as moot, and transferred the case to this Court. Text Order of
May 21, 2020; DKT #11.

Following transfer, USCCB sought and received a 30-day extension to answer the
complaint. DKT #14. USCCB filed its Answer on July 6, 2020, denying almost every single
allegation in the complaint. DKT #20. The Court then set an Initial Scheduling Conference and
instructed the parties to confer about a discovery plan. DKT #21. USCCB filed the instant
motion the very next day. DKT #22. Although Mr. O'Connell—as suggested by the Court's
Order setting the Initial Scheduling Conference—sent USCCB an early request for production of
documents pursuant to Fed. R. Civ. P. 34, there has been no discovery at all in the case. The
Court vacated the Initial Scheduling Conference in light of USCCB's motion. Minute Order of
July 10, 2020.

IV.    **USCCB fails to show entitlement to judgment under Rule 12(c) as to any of the three claims**

    A.    **Standard of review under Rule 12(c)**

This Court analyzed in depth the legal standards applicable to a motion for judgment on the pleadings under Rule 12(c) in *Murphy v. Dept. of Air Force*, 326 F.R.D. 47, 48-50 (D.D.C. 2018). USCCB incorrectly says that the Rule 12(c) standard of review is virtually identical to that of a Rule 12(b)(6) motion, and then incongruously targets the sufficiency of the complaint's allegations pursuant to Rule 12(b)(6), deriding them as "vague and conclusory." Motion at 6. But Your Honor has previously cautioned against treating Rule 12(b)(6) motions and Rule 12(c) motions as indistinguishable and interchangeable, noting specifically that:

> [A] party seeking judgment on the pleadings under Rule 12(c) *must make a different showing* than a defendant who requests that the complaint be dismissed under Rule 12(b)(6)—i.e., the Rule 12(c) movant must demonstrate that the law entitles him to win given the undisputed facts that have been alleged in both parties' pleadings—and when considering a motion brought under Rule 12(c), the court *must make a different finding* than the mere determination that the Plaintiff's complaint is too deficient to proceed.

*Id*. at 49 (emphasis in original).

Thus, USCCB's de facto Rule 12(b)(6) motion misses the mark. Under Rule 12(c), the court is required to treat all of the allegations in the complaint as true and undisputed, yet USCCB placed them all in issue by filing its denial-laden answer (specifically denying all of the factual allegations that are the basis for the claims of fraud, breach of fiduciary, and unjust enrichment). *See generally* Answer. Thus, there are now multiple material disputes of fact that prevent the Court from resolving the claims on their merits under Rule 12(c). *Murphy*, 326 F.R.D. at 49-50.

**B.      USCCB's challenge to Mr. O'Connell's fraud claims is procedurally improper and meritless**

USCCB devotes a significant portion of its motion to attacking the specificity of Mr. O'Connell's fraud allegations, relying on Fed. R. Civ. P. 9(b). Motion at 7-15. The main purpose of Rule 9(b) is to ensure that defendants have adequate notice of the charges against them to prepare a defense. *U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F.Supp.2d 114, 116 (D.D.C. 2003). For two reasons, USCCB's implicit argument that it lacks notice of the nature of the fraud allegations should be rejected.

*First*, USCCB's Rule 9(b) challenge is procedurally improper. After being served with the complaint in January, DKT #4, USCCB responded in February with its Rule 12(b)(2) and (b)(3) motion to dismiss. DKT #7. While USCCB chose to target personal jurisdiction and venue exclusively, it could have made the Rule 12(b)(6) argument challenging the specificity of any allegations in the complaint at that time, but it did not. *Id*. Following the transfer of the case to this Court, USCCB received an extension of time in excess of a month to answer the complaint, which it did in July. DKT #20. Tellingly, nothing in USCCB's answer—in which it denies essentially all of the substantive allegations of the complaint—mentions lack of specificity under Rule 9(b) or otherwise takes issue with the particularity of any of the allegations. *See generally id*. Only after answering—and after the Court issued an Order setting an initial scheduling conference, and after Mr. O'Connell served an early Rule 34 request for production—did USCCB raise its Rule 9(b) argument, in the context of a motion for judgment on the pleadings.

Federal courts do not look favorably on post-answer challenges to the specificity of allegations under Fed. R. Civ. P. 9(b). In denying a Rule 9(b) challenge made after the defendant had answered, one court noted that "[w]hile the rules do not specifically state that a party can waive a challenge under Rule 9(b), the rules serves little purpose when a party has already been

12

capable of answering the claim and providing initial disclosures relevant to the claim." *Unified Container, LLC v. Mazuma Capital Corp.*, 280 F.R.D. 632, 636 (D. Utah 2012). Another court rebuffed a post-answer Rule 9(b) challenge the defendant made in a Rule 12(c) motion for judgment on the pleadings, observing: "In essence this is a 12(b)(6) motion, and serial 12(b)(6) motions are disfavored. There is no reason why [defendant] could not have presented these arguments in their earlier motions. A motion attacking sufficiency of pleadings in [a] fraud case is a well-known and common pre-answer motion." *Northrop Grumman Corp. v. Factory Mutual Ins. Co.*, Case No. CV 05-08444 DDP (PLAx), 2006 WL 8422003 (C.D. Cal. Aug. 9, 2006), at *2.

As discussed in *Murphy*, "a Rule 12(c) motion requires the court to consider and decide the merits of the case, *on the assumption that the pleadings demonstrate that there are no meaningful disputes as to the facts such that the complaint's claims are ripe to be resolved at this very early stage in the litigation.*" *Murphy*, 326 F.R.D. at 49 (emphasis added). Thus, where a motion to dismiss argues solely that a complaint fails to state a claim—as USCCB's motion argues in exclusively challenging the specificity of the fraud allegations under Rule 9(b)—it neither addresses the existence or absence of disputed material facts nor attempts to evaluate the merits of the claim in light of existing law, and it therefore fails to conform to the applicable legal requirements. *See id*. at 50 (denying defendant's request to convert a Rule 12(b)(6) motion to a Rule 12(c) motion and striking motion).

Entirely by choice, USCCB has answered Mr. O'Connell's complaint with specific denials of the factual allegations, obliterating any argument that the allegations fail to give it adequate notice to prepare a defense. *McCready*, 251 F.Supp.2d at 116. And in focusing only on the purported lack of specificity of the allegations, USCCB paradoxically avoids any evaluation

of their merits, which Rule 12(c) requires of a movant. *See* Motion at 7-15; *Murphy*, 326 F.R.D. at 50. The record of this case and the law are both sufficiently clear that USCCB's motion for judgment on the fraud claims should be denied on this basis alone. *Compare* Complaint *with* Answer; *see also Murphy*, 326 F.R.D. at 49-50.

   *Second*, even if the Court were to evaluate the specificity of the fraud allegations under Rule 9(b), it should conclude that they state a claim and, accordingly, that dismissal is not warranted. Your Honor analyzed and applied the Rule 9(b) standard in significant depth in *U.S. ex rel. Tran v. Computer Sciences Corp.*, 53 F. Supp. 3d 104, 114-15, 122-26 (D.D.C. 2014). Your Honor noted that "[m]otions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b), which are: to 'ensure that defendants have adequate notice of the charges against them to prepare a defense[.]'" *Tran*, 53 F. Supp. 3d at 115 (quoting *McCready*, 251 F.Supp.2d at 116). After observing that "Rule 9(b) does not abrogate Rule 8, and must be read in light of Rule 8's requirement that allegations be simple, concise, and direct, and short and plain statements of each claim," *Tran*, 53 F. Supp. 3d at 115, the Court stated that it "should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id*. (quoting *McCready*, 251 F.Supp.2d at 116).

   In applying the standard to a defendant's motion to dismiss a relator's False Claims Act allegations for lack of specificity, Your Honor rejected the argument that not pleading the particular dates on which a defendant submitted false invoices made the FCA claim deficient, holding that Rule 9(b) does not require that level of specificity in such cases. *Tran*, 53 F. Supp. 3d at 123. Further, the Court rejected the arguments that "Relator has not alleged that any

particular false claim or statement was actually made" and "failed to plead the how or when of the fraud with any particularity," *id*. at 124, holding that the Relator "plead numerous facts from which an inference can be drawn that [illegally] passing through the vast majority of the work allegedly performed by small businesses was standard operating procedure" for the defendant, detailing allegations about the alleged wrongful conduct generally. *Id*. at 124-25; *see also id*. at 125-26 (drawing inferences about materiality from general allegations).

Here, USCCB's argument relies entirely on ignoring almost all of the allegations in the complaint about its conduct in promoting and administering the Peter's Pence collection, instead focusing myopically on the "who, what, where" of Mr. O'Connell's recollected account of his experience in the summer of 2018 when he made a cash donation to Peter's Pence at Sunday mass at Sacred Heart Church in East Providence, Rhode Island after hearing a USCCB-directed pulpit solicitation. *See generally* Motion at 7-15; *compare* Complaint at 14-15 (¶¶ 34-36).

It is true that in his complaint, Mr. O'Connell does not include a verbatim recitation of each word spoken from the pulpit about Peter's Pence, or name the priest who said the words he heard, or even assign a specific dollar amount to the cash contribution he made to the Peter's Pence Collection after hearing the USCCB-scripted solicitation. But—as is evident from the allegations throughout his complaint, and from the law—that level of specificity is not required. The Court can and should infer from the complaint's allegations that USCCB sent a script to East Providence to be read from the pulpit that informed Mr. O'Connell (and all donors in all churches in all dioceses across the country heard the same appeal on the same day) that the purpose of the collection was to help those "enduring the effects of war and violence, natural disasters, and religious persecution." *See, e.g.*, Complaint at 8 (¶ 24).

And the Court should likewise infer that after hearing USCCB's scripted appeal, Mr. O'Connell understood that any donation to Peter's Pence would be applied right away to help those in need of emergency assistance, and that Mr. O'Connell's cash donation was not used for the advertised purposes— and, in fact, was diverted elsewhere. *See* Complaint at 9-15 (¶¶ 26-36).[16] Those allegations are sufficient for purposes of Rule 9(b). *Tran*, 53 F. Supp. 3d at 104, 114-15, 122-26; *McCready*, 251 F.Supp.2d at 116.

In sum, the Court should deny USCCB's Rule 12(c) motion to dismiss the fraud claims based on their purported lack of specificity. USCCB has answered the complaint and obviously understands the nature of the allegations very well, making its Rule 9(b) challenge procedurally flawed and, as a practical matter, pointless. Regardless, even applying the Rule 9(b) standard, there is no reason to find that Mr. O'Connell's allegations are insufficiently particularized. The fraud claims[17] should proceed forthwith to discovery.

---

[16] The Court should reject USCCB's insinuation that it was ignorant of the diversion of Peter's Pence funds into investments at the time Mr. O'Connell made his 2018 donation merely because the news reports cited in the Complaint are from late 2019. *See* Motion at 13-14. The reports make clear that the diversion had been taking place for years, and the investigative reporting dating back several years was undoubtedly known to members of the Catholic hierarchy in the United States. *See supra* nn.11, 12. Additionally, USCCB's Guidelines require USCCB to ensure that all donated funds are spent for their intended purpose, thereby charging USCCB with knowledge of their ultimate disposition. *See supra* Part II(A) at 2-5. Discovery will shed greater light on USCCB's utter inaction to ensure the contributions were spent for the poor.

[17] Mr. O'Connell's fraud allegations are based on USCCB's affirmative misrepresentations (Complaint at 19-20 (¶¶ 47-51)) and its fraudulent concealment of material facts (Complaint at 19-21 (¶¶ 47, 52-56)). In addition to its challenge for lack of specificity, USCCB also attacks the fraudulent concealment allegations on the ground that it had no "duty to disclose" the truth to Mr. O'Connell for the same reason it purportedly had no fiduciary duty to him. *See* Motion at 12 (referencing Motion at Part III). Mr. O'Connell accordingly refers to Part IV(C) *infra* at 17-19 in response to this argument.

C.     **USCCB cannot disavow its own Guidelines in an attempt to disclaim any fiduciary duty to donors**

USCCB's Rule 12(c) motion also challenges the sufficiency of the allegations of Mr. O'Connell's breach of fiduciary duty claim by lamenting that "it arises out of the same sparse nucleus of fact as his fraud claim," Motion at 19. While USCCB makes a passing mention of "the exacting pleading standards of Rule 9(b)," *id*., the thrust of its argument is to disclaim any fiduciary relationship to Mr. O'Connell or any donor to Peter's Pence. *Id*. at 19-22.

While the Court could summarily reject USCCB's request for dismissal of this claim because, like its attack on the fraud allegations, it is procedurally improper, USCCB's argument fails for other reasons. This Court routinely denies requests to dispose of claims for breach of fiduciary duty on motion. *See, e.g.*, *Democracy Partners v. Project Veritas Action Fund*, --- F. Supp. 3d ---, Civil Action No. 17-1047 (ESH), 2020 WL 1536217 (D.D.C. March 31, 2020), at *11-*14; *Cordoba Initiative Corp. v. Deak*, 900 F. Supp. 2d 42, 48-49 (D.D.C. 2012); *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F.Supp.2d 311, 341-42 (D.D.C. 2011); *Church of Scientology Intern. v. Eli Lilly & Co.*, 848 F.Supp. 1018, 1027-28 (D.D.C. 1994); *see also Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C. Cir. 1996). The reason for this is explained eloquently in *Gaubatz*:

> Significantly, the District of Columbia courts have deliberately left the definition of a "fiduciary relationship" open-ended, allowing the concept to fit a wide array of factual circumstances. [...] Deciding whether a fiduciary relationship exists in a particular case requires "a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties." [...] Because the inquiry is fact-intensive, *it is often inappropriate to decide whether a fiduciary relationship existed even in the context of a motion for summary judgment*. [...] Consistent with this observation, courts have observed that a claim for breach of fiduciary duty is generally not amenable to dismissal for failure to state a claim when the claimed ground for dismissal is the absence of a fiduciary relationship.

*Gaubatz*, 793 F.Supp.2d at 341 (citations and quotations omitted) (emphasis added).

Here, other than questioning the sufficiency of the allegations, USCCB's *only* claimed ground for dismissal of the fiduciary duty claim is the ostensible absence of a fiduciary relationship. Motion at 19-22.[18] Against this, the complaint makes clear that per its own Guidelines, USCCB requires—of itself, its dioceses, and churches—scrupulous honesty, transparency, and accountability to donors at every step of every collection process, to ensure that donor intent is honored. *E.g.*, Complaint at 9-10 (¶ 26). As the only entity in charge of promoting and administering the Peter's Pence collection in the United States, which it does pursuant to Guidelines that are binding upon dioceses, USCCB has a fiduciary duty to donors to act as a fiduciary and honor donor intent when it solicits charitable donations through its subordinates. *Id.* at 9-10 (¶ 26), 22 (¶ 62). And, if it engaged in the slightest due diligence promised to its donors to ensure that donations were actually being deployed as represented, USCCB certainly would have discovered their diversion years ago, as was known by many in the Catholic hierarchy.[19]

Moreover, in many jurisdictions around the country, state statutes explicitly define anyone who solicits charitable contributions as a fiduciary. *See, e.g.*, UTAH CODE ANN. § 13-22-23  ("Every person soliciting, collecting, or expending contributions for charitable purposes, and every officer, director, trustee, or employee of any person concerned with the solicitation, collection, or expenditure of those contributions, shall be considered to be a fiduciary and acting in a fiduciary capacity."); OHIO REV. CODE ANN. § 1716.17 ("Every person who solicits,

---

[18] At the end of the section of its Motion attacking the breach of fiduciary duty claim, USCCB argues (rather confusingly) that no breach was alleged because "USCCB had no role in determining how the funds were ultimately used." Motion at 21-22. Aside from the fact that this is a misplaced challenge to the sufficiency of the allegations, USCCB relies on its Declaration to support this argument, and discovery is necessary to determine all that USCCB actually does and does not do with respect to the collection, particularly in light of its Guidelines requiring it to ensure that all donor money is spent for its intended purpose. Fed. R. Civ. P. 12(d); *Hurd*, 864 F.3d at 687.

[19] *See supra* Part II(C) at 7 & nn.11, 12. Discovery will establish more specifics of USCCB's actual knowledge.

collects, or expends contributions on behalf of a charitable organization or for a charitable purpose, or who conducts a charitable sales promotion, and every officer, director, trustee, or employee of that person who is concerned with the solicitation, collection, or expenditure of those contributions shall be considered a fiduciary and as acting in a fiduciary capacity."). Although the District of Columbia has no directly analogous statute, its substantive law allowing beneficiaries to enforce the terms of charitable trusts is consistent with the intent of such statutes. *See, e.g.*, *He Depu v. Yahoo, Inc.*, 950 F.3d 897, 908 (D.C. Cir. 2020).

Regardless, the Court need only take at face value USCCB's own Guidelines to recognize that, in soliciting charitable donations, USCCB considers itself and its subordinate agents to be fiduciaries. It would be unreasonable to infer that the intent of the "One Church, One Mission" Guidelines is anything other than to hold all those involved in the process in national charitable collections like Peter's Pence to a fiduciary standard when soliciting parishioners. Mr. O'Connell's allegations are more than sufficient to state a claim that USCCB acts as a fiduciary, and his claim should proceed to discovery.[20]

### D. The Court can order USCCB to disgorge unjust enrichment even if USCCB does not hold onto the money

USCCB's attack on the unjust enrichment claim boils down to a very simple premise: because it does not hold onto the money, it cannot give it back. According to USCCB, it is not liable for disgorgement on an unjust enrichment theory because, it says, it is not a "collection point" for Peter's Pence as it is with other collections, and even when dioceses send Peter's Pence money to it "as happens on occasion," it ships out all the funds to the Vatican embassy. Declaration at 1-3 (¶¶ 3, 4); Motion at 15-19. USCCB also makes much of a "transmittal form"

---

[20] *See supra* nn.16, 18, 19.

for use by dioceses, directing that Peter's Pence money be sent to the Vatican embassy, as further "proof" that it is not susceptible to a claim for unjust enrichment on the facts alleged. Motion at 17-18 & nn.12, 20.

Under the law of the District of Columbia, unjust enrichment is an equitable claim—"a '[l]egal fiction' designed 'to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise.'" *In re APA Assessment Fee Litig.*, 766 F.3d 39, 46 (D.C. Cir. 2014) (quoting *4934, Inc. v. D.C. Dept. of Employment Servs.*, 605 A.2d 50, 55 (D.C. App. 1992); *see also U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 141-42 (D.D.C. 2010) (quoting *4934, Inc.*, 605 A.2d at 56) ("[U]njust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next."). As such, district courts have broad discretion to apply equity and fashion appropriate remedies. *See, e.g., Sec. & Exch. Comm'n v. Contorinis*, 743 F.3d 296, 307 (2d Cir. 2014).

In *Contorinis*, the Second Circuit affirmed a district court's assessment of a disgorgement remedy against an illegal inside trader, even though he was trading on behalf of a company using funds he did not own, producing illegal profits that he did not personally realize. The appeals court reasoned:

> [U]njust enrichment may also be prevented by requiring the violator to disgorge the unjust enrichment he has procured for the third party. […] [W]hen third parties have benefitted from illegal activity, it is possible to seek disgorgement from the violator, even if that violator never controlled the funds. The logic of this […] is that to fail to impose disgorgement on such violators would allow them to unjustly enrich their affiliates. Thus, ordering a violator to disgorge gain the violator never possessed […] serves disgorgement's core remedial function of preventing unjust enrichment. District courts possess the equitable discretion to determine whether disgorgement liability should fall upon third parties or

20

violators, a responsibility concordant with the district courts' broad discretion to
assay disgorgement more generally.

743 F.3d at 307.

The Second Circuit's reasoning is not limited to the context of insider trading. Following

*Contorinis*, the Sixth Circuit applied a disgorgement remedy for unjust enrichment in the probate

context. *Osborn v. Griffin*, 865 F.3d 417, 455 (6th Cir. 2017) ("[i]n sum, it does not matter that

Defendants gave Plaintiffs' property to innocent third parties; the property was not Defendants'

to dispose of"); *see also Westrick*, 685 F. Supp. 2d at 142 ("Toyobo argues that the government

never conferred any benefit upon it because all federal monies were paid to Second Chance. …

However, the government alleges that payment for Second Chance's submissions was based

upon Toyobo's false statements and omissions, and Toyobo, as an indirect recipient of the

government's payments, was unjustly enriched to the government's disadvantage.") (citations

omitted).

USCCB relies chiefly on two cases in which the Court said an unjust enrichment claim

could not be maintained against a defendant who did not retain the funds in dispute, but neither is

controlling. USCCB suggests (Motion at 17) that the memorandum order in *Sabre Int'l Sec. v.*

*Torres Advanced Enter. Sols., LLC*, 60 F. Supp. 3d 36, 41-42 (D.D.C. 2014) disposes of Mr.

O'Connell's claim, but that order—the fifth in a series—involved a complicated dispute among

multiple parties with contractual business relationships, and it is simply not analogous to the

facts of this case. Neither does *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 8 (D.D.C. 2008)

(quoted in Motion at 18) compel dismissal; as in *Sabre*, an express contract governed the

relationship between the plaintiff and another defendant in that case, distinguishing it from the

facts presented here. Moreover, the plaintiffs in both *Paul* and *Sabre*—unlike Mr. O'Connell—

never alleged that they were defrauded out of their own money, or that any money passed

21

from them to the collecting defendant to another entity, as the plaintiffs in those cases never paid anything to anyone. *See Sabre,* 60 F. Supp. 3d at 41-42; *Paul*, 543 F. Supp. 2d at 8.

The reasoning for the equitable approach adopted by the Second Circuit in *Contorinis* and the Sixth Circuit in *Osborn* should lead the Court to determine that, on the facts he alleges, Mr. O'Connell states a claim for unjust enrichment. It is plain that discovery is needed to determine how the Peter's Pence funds travel from the pockets of parishioners into Swiss hedge funds and other improper places, and the evidence offered by USCCB saying that it *usually* does not receive Peter's Pence money from the dioceses raises far more questions than it answers. And the empty "transmittal form" USCCB cites is itself proof of nothing, but it does suggest USCCB plays a role in overseeing the disposition of Peter's Pence donations in the United States, as it appears to require all dioceses to report to USCCB all amounts collected, broken down by parish collections and individual gifts.[21] Why is this necessary, if USCCB has no role or interest in the monies collected?

In sum, even if it is ultimately determined that USCCB in fact does not retain any of the monies donated for Peter's Pence, under the law, that alone does not mean USCCB can never be liable to disgorge the monies on an unjust enrichment theory. The Court should accordingly reject USCCB's motion for judgment on this claim.

---

[21] *See* Transmittal Form, http://www.usccb.org/about/national-collections/collection-administration/upload/ppc-2013.pdf (accessed July 23, 2020), cited in Motion at 17-18 & nn.12, 20.

V.     **USCCB fails to establish that the Court lacks subject matter jurisdiction under Rule 12(b)(1)**

A.     **Standard of review under Rule 12(b)(1)**

This Court considered the legal standard for 12(b)(1) motions in *Cause of Action Inst. v. Internal Revenue Serv.*, 390 F. Supp. 3d 84, 91-92 (D.D.C. 2019). The question whether a court has subject matter jurisdiction concerns its power to entertain a case in the first place, and it is thus separate from whether the plaintiff's allegations entitle her to relief. *Id*. at 91. Nevertheless, in deciding a 12(b)(1) motion, a court should treat the complaint's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged while giving closer scrutiny to the factual allegations than in a Rule 12(b)(6) context. *Id*. The court may also look to documents outside of the complaint to evaluate whether or not it has jurisdiction to entertain a claim. *Id.*

In its motion, USCCB dodges this standard. It cites Fed. R. Civ. P. 12(h)(3) as the only applicable rule, and only for the anodyne proposition that subject matter challenges can arise at any time. Motion at 7. Notwithstanding, it is clear that Rule 12(b)(1) "delineates the defense of lack of subject-matter jurisdiction." *Dentons US LLP v. Rep. of Guinea*, 134 F. Supp. 3d 5, 7 (D.D.C. 2015). This forces USCCB to directly address all of the allegations of the complaint (all accepted as true) in establishing why the Court lacks jurisdiction (contrary to USCCB's approach, as discussed *infra*, which depends on ignoring the complaint's allegations entirely).

B.     **Accepting the allegations as true, the Court can resolve the claims against USCCB without interpreting religious questions and by applying neutral principles of law, and it therefore has subject matter jurisdiction**

USCCB argues that "the ecclesiastical abstention doctrine" deprives this Court of subject matter jurisdiction over this case. Motion at 23; *see generally id*. at 22-27. Flying in the face of

the applicable standard of review, USCCB makes its jurisdictional challenge by entirely ignoring the allegations of the complaint, instead conjuring—without reference to any allegations in particular—that the complaint raises "basic questions about how the highest authorities of the Church may choose to allocate those [Peter's Pence] funds to support the religious mission of the Church in general and the Pope in particular[.]" *Compare* Motion at 22-23 *with* Complaint; *see also Cause of Action Inst.*, 390 F. Supp. 3d at 91-92.

As a general matter, religious organizations are susceptible to federal court jurisdiction even though they are not secular entities. The applicability of ecclesiastical abstention turns on whether a court will be required to interpret religious doctrine or practice in order to resolve the claims against the religious organization; if the claims can be resolved through neutral and generally applicable principles of law, the court should reject the challenge to its jurisdiction.

Numerous cases illustrate and apply this principle, including several relied on by USCCB. *See, e.g., Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F. Supp. 3d 71, 78-79 (D.D.C. 2019); *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 48-49 (D.D.C. 2017); *Schmidt v. Catholic Diocese of Biloxi*, 18 So. 3d 814, 830-32 (Miss. 2009) (all cited by USCCB in Motion at 24-26). In *Ambellu*, this Court found that fraud-based RICO claims and claims for breach of fiduciary duty brought by former parishioners against a church were capable of resolution using secular legal principles, and it denied the church's motion to dismiss them pursuant to ecclesiastical abstention. 387 F.Supp.3d at 78-79.[22] Notably, the Court contrasted these claims with others that it dismissed under the abstention doctrine, reasoning that those claims (negligent and intentional infliction of emotional distress arising from allegations that they had been denied

---

[22] The Court ultimately dismissed these claims on other grounds. *Ambellu*, 387 F.Supp.3d at 82-86.

access to the church) would enmesh the Court in religious questions by requiring it to determine who may worship there. *Id*. at 79-80.

In *Gregorio*, this Court rejected the jurisdictional challenge of a church to the breach of contract claim for payment of a stipend brought by its former pastor, noting that its resolution would not require excessive entanglement with religious doctrine or anything other than neutral methods of proof. 238 F. Supp. 3d at 48-49. And in *Schmidt*, the Mississippi Supreme Court reasoned similarly in reversing the dismissal under ecclesiastical abstention of breach of fiduciary duty and fraud claims against a church and its pastor for diversion of designated donations, holding that "[t]he cloak of religion does not shield religious institutions from civil liability for fraud" and that "the First Amendment does not protect fraudulent statements that concern neither religious doctrine nor practice." 18 So. 3d at 831.

Other courts have similarly rejected ecclesiastical abstention challenges, noting that where the motion to dismiss is, as here, only a general challenge to the Court's subject matter jurisdiction not directed at particular claims, there is no need to analyze every one of the claims for the purpose of determining whether they require an interpretation of church doctrine. *Smith v. O'Connell*, 986 F. Supp. 73, 81-82 (D.R.I. 1997); *Rashedi v. Gen'l Bd. of Church of Nazarene*, 54 P.3d 349, 354-55 (Ariz. 2002).

And while USCCB also touts a "'long line' of Supreme Court precedent," Motion at 23, it does not help its argument at all. USCCB leans heavily into *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976) (cited in Motion at 23-24), but that has no application here. *Milivojevich* involved the defrocking of a Serbian Orthodox Bishop by an ecclesiastical court, unsurprisingly resulting in the Supreme Court's determination that the First Amendment requires civil courts to accept that ecclesiastical decision. 426 U.S. at 713. More apposite is *Illinois ex rel.*

25

*Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 605 (2003), in which the Supreme Court held that the First Amendment does not bar claims for fraud against charitable solicitors who make misleading statements to prospective donors.

Mr. O'Connell's claims in this case do not turn on questions of religious doctrine. The allegations in his complaint clearly focus on USCCB's misrepresentations to donors for contributions to help the needy (which sadly ended up elsewhere). Resolving these claims will not ensnare the Court in adjudicating matters of Canon Law, but rather will involve only the application of straightforward common law principles.[23] Accepting all the allegations as true, there is no question that the Court has subject matter jurisdiction, and that the ecclesiastical abstention doctrine does not apply here.

## VI.      Conclusion

Mr. O'Connell and the proposed Class do not complain about the religious practices of USCCB, the Vatican, or the Pope. Their complaint is about fraudulent representations that dispossess well-intentioned donors of money that could otherwise go to help the suffering. For the Court to hold that the ecclesiastical abstention doctrine deprives it of subject matter jurisdiction in this case, it would need to accept USCCB's invitation to overlook all the allegations of the complaint—but the claims require only a straightforward application of neutral common law principles to determine USCCB's liability for misleading donors to Peter's Pence.

---

[23] USCCB notes that absent a conflict of law, a choice of law analysis is unnecessary. Motion at 7 n.14. In its motion, USCCB never engages in a choice of law analysis, and it also suggests that the relevant laws of the District of Columbia where it is based and Mr. O'Connell's home state of Rhode Island do not conflict, although most of its argument assumes the application of D.C. law to all the claims. *See generally* Motion at 7-22. Mr. O'Connell does not foresee any conflict of law in connection with any claims, and he recognizes that D.C. law may apply to the claims of all members of the proposed Class.

And the Court clearly should not hold that USCCB is entitled at this stage to a judgment on the merits of any one of the claims, particularly when USCCB—having specifically denied the allegations of the complaint—ignores Rule 12(c)'s requirements and instead relies almost entirely on misplaced harping about whether the complaint pleads with sufficient particularity.

The best course of action for the Court is to deny USCCB's motion in its entirety, and to order that discovery proceed forthwith. Instead of the "trial by website" USCCB favors, the parties should proceed to develop a fulsome factual record that will shed light rather than confusion on USCCB's involvement (or not) in facilitating the transfer of millions of dollars of charitable contributions intended for the needy into Swiss bank accounts and luxury condominiums. With all its unequivocal commitments to scrupulously ensuring that donor intent is honored at every step of the collection process, USCCB should be especially eager to demonstrate that its assurances are indeed of the highest caliber, and that it embraces rather than runs from a relationship of trust and confidence with donors throughout every facet of its charitable efforts.

August 7, 2020                                    Respectfully submitted,


                                                  /s/ *Martin Woodward*
                                                  Marc R. Stanley
                                                  D.C. Bar No. 1005822
                                                  marcstanley@mac.com
                                                  Martin Woodward
                                                  Texas Bar No. 00797693
                                                  (Admitted *pro hac vice*)
                                                  mwoodward@stanleylawgroup.com
                                                  **STANLEY LAW GROUP**
                                                  6116 N. Central Expressway
                                                  Suite 1500
                                                  Dallas, Texas 75206
                                                  214.443.4300
                                                  214.443.0358 (fax)


                                                  *Counsel for Plaintiff and the
                                                  proposed Class*



### Certificate of Service

I hereby certify that on August 7, 2020, a copy of this document was filed electronically on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on all counsel of record.


                                                  /s/ *Martin Woodward*
                                                  Martin Woodward